UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |
|---|---|
| RICKY SOUCY, SR.,<br><br>          Plaintiff<br><br>     v.<br><br>SERGEANT THOMAS AVERILL, et al.,<br><br>          Defendants | **1:20-cv-00024-JDL** |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendants State of Maine, Averill, Touchette, and Soper (collectively, the "Defendants") hereby submit this Motion for Summary Judgment, with incorporated memorandum of law, and respectfully request that summary judgment be entered in their favor on all of the claims brought against them by the Plaintiff.

## MEMORANDUM OF LAW

Plaintiff Soucy, an inmate in the custody of the State of Maine Department of Corrections ("DOC"), brought a complaint against numerous defendants alleging a variety of violations. ECF No. 1. Following the Court's review, the remaining claims are a claim under the Eighth Amendment against the individual defendants Averill, Touchette, and Soper, based on the allegation that they dragged Soucy from the Close Unit to the Medium Unit in the Maine State Prison on August 31, 2017; and a claim against the State of Maine under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act based on the claim that Soucy was denied the use of a wheelchair that was necessary due to his disability for the move from the Close Unit to the Medium Unit. ECF Nos. 13, 15, 24, 29.

Defendants Averill, Touchette, and Soper are entitled to summary judgment because they did not violate Soucy's constitutional rights. They did not act with deliberate indifference to Soucy's serious medical need or apply force maliciously and sadistically for the purpose of causing harm. Even if Soucy could establish a violation of his constitutional rights, Defendants are entitled to qualified immunity because Soucy's alleged right to use a wheelchair was not clearly established where Soucy was not assigned a wheelchair, frequently walked around the Prison, and medical staff did not restrict his ability to walk. An objectively reasonable officer in Defendants' position would not have known that his conduct violated the law.

Defendant State of Maine is entitled to summary judgment because it did not deny him a reasonable accommodation. There is no medical evidence supporting his claimed inability to walk from Close to Medium with or without assistance. Soucy lived on the second floor of his unit, where he did not use a wheelchair, and he frequently walked around the unit, up and down stairs. He sometimes walked to and from the medical unit—a distance longer than walking from Close to Medium—with two officers escorting him. The State accommodated his disability by providing two officers who held his arms and supported him. The State was entitled to rely on the information it received from CCS, which did not restrict Soucy's ability to walk and confirmed that Soucy did not require a wheelchair for the move from Close to Medium.

### *Facts*

The State's Department of Corrections ("DOC") operates the Maine State Prison ("Prison"). Defendants' Statement of Material Facts ("DSMF") ¶¶ 1-2. Soucy is a prisoner in DOC's custody and entered the Prison in 2004. DSMF ¶¶ 3-4. In August 2017, Defendants Sergeant Averill, Officer Touchette, and Officer Soper all worked at the Prison. DSMF ¶¶ 5-7. Soucy was housed on the second floor of the Close Unit in F Pod in a single cell without a

roommate. DSMF ¶¶ 8-10. Soucy received medical services from DOC's health services contractor, CCS. DSMF ¶¶ 11. He was diagnosed with several serious health conditions and complained of chronic pain. DSMF ¶¶ 11-13, 26-27. He was being evaluated for spinal injections for the pain. DSMF ¶¶ 26-28. He was ambulatory, with some difficulty, and was neither wheelchair bound nor assigned his own wheelchair, which was why he could live on the second floor. DSMF ¶¶ 14-15, 26-28. Soucy walked from his pod on the second floor down the stairs and back up as often as twice a day for meals, and also to get mail, go to the rec yard, go to the medical clinic, or otherwise leave the pod. DSMF ¶¶ 16-19. Sometimes he walked to the medical unit and back, with officers escorting him; that round trip is longer than the distance from Close to Medium. DSMF ¶¶ 23-25. He also walked downstairs and pushed the chow cart. DSMF ¶¶ 20-22. Before and after August 31, 2017, Soucy wanted to live on the second floor of Close and declined to have a wheelchair assigned to him. DSMF ¶¶ 18-19, 105-06. According to the Physical Activity Limitation sheet in his medical records, as well as the "Current Alerts" form that was available to DOC personnel, Soucy was allowed to use a wheelchair but he was not required to use one and he was not medically restricted from walking. DSMF ¶¶ 29-35, 87-90.

Some time on or before August 31, 2017, it was decided that Soucy would be reassigned and moved to a cell in Medium. DSMF ¶ 37. None of the individual defendants were involved in that decision. DSMF ¶ 38. On August 31, 2017, Soucy was told he was moving from Close to Medium. DSMF ¶ 39. Soucy refused to pack his belongings. DSMF ¶¶ 40-42. Instead he walked from his pod downstairs to the Sergeant's Office and argued with Sergeants Averill and Court. DSMF ¶¶ 42-44. Soucy was adamant that he did not want to leave his single cell for mental health reasons and said he had been promised he would never have a roommate. DSMF ¶¶ 44, 46, 67-70, 80. Soucy raised his voice and said he would not go to Medium and would go to Seg

3

instead. DSMF ¶¶ 47-48, 68, 108. When Soucy refused to move to Medium, he was put on Emergency Observation Status, placed in hand restraints, and escorted to Medium with Touchette and Soper on either side of him holding him by the arms to protect him from falling, accompanied by Averill. DSMF ¶¶ 49-52. The "Current Alerts" in DOC's system did not state that Soucy had any medical restrictions on walking. DSMF ¶¶ 30, 89. Soucy threw a tantrum, kept saying he did not want to go to Medium, and asked whether someone had to kill someone to be taken seriously. DSMF ¶¶ 53, 59, 84. Sometimes Soucy's legs gave out and he stumbled, but he did not fall because Touchette and Soper were holding him up and taking some of his 300-lb weight off of his legs. DSMF ¶¶ 54-55. At no time did the officers use force against Soucy or drag him. DSMF ¶ 56. Soucy testified he fell to the ground only once, which is when he claims he cut his leg, and then they continued walking. DSMF ¶ 58.

Soucy asked to see mental health, which Averill told the Sergeant in Medium, and mental health was called. DSMF ¶¶ 60, 63-65. After Averill, Touchette and Soper left Soucy in Medium, Soucy injured his own wrist so that he would be sent to Seg or back to Close instead of a cell with a roommate. DSMF ¶¶ 60-70, 75-76. His self-injury to his wrist was treated in Medium by a CCS nurse, who noted there were three spots of blood on his leg and an abrasion on his wrist. DSMF ¶¶ 71-72. Soucy did not report other injuries besides his wrist to the nurse and he declined to go to the medical clinic for further assessment. DSMF ¶¶ 72-74. Soucy continued to claim he would hurt himself or others until he was returned to Close, which he was on or about September 1, 2017. DSMF ¶¶ 75-77. In subsequent days and weeks, Soucy did not seek medical treatment for any injuries sustained on August 31, 2017. DSMF ¶¶ 78-80, 97-106. He continued to insist that he not have a roommate. DSMF ¶¶ 80, 98-100, 102, 105-09. He continued to live on the second floor of Close and declined to have a wheelchair assigned to him.

DSMF ¶¶ 105-106, 108-09. After Soucy was transferred to another facility in 2018, he was issued a walker and a wheelchair. DSMF ¶¶ 110-11. Soucy does not know to what extent, if any, the August 31, 2017 incident has contributed to his medical condition since then. DSMF ¶ 107.

On August 31, 2017, Defendants knew that Soucy lived on the second floor, was not issued a wheelchair, and routinely walked around the Prison grounds. DSMF ¶¶ 14-28, 36. They were not made aware of any medical restrictions on his walking or any medical requirement that he use a wheelchair. DSMF ¶¶ 29-36, 87-92. On September 8, 2017, Soucy filed a grievance in which he claimed he asked for a wheelchair after being handcuffed, and was cut on his knee, wrist and arm and bruised on his arm from falling from being forced to walk. DSMF ¶¶ 81-82, 96. Soucy did not write in the grievance that he was dragged. *Id*. Soucy sought no medical care for these alleged injuries. DSMF ¶ 83. After Soucy filed the grievance, Averill wrote a report explaining that Soucy's Current Alerts did not restrict his walking and CCS staff confirmed that Soucy did not require a wheelchair to go from Close to Medium. DSMF ¶¶ 86-92. The grievance was denied because there were no medical restrictions on Soucy's ability to walk. DSMF ¶¶ 85, 95. Averill, Touchette and Soper did not think Soucy needed a wheelchair to go from Close to Medium for these reasons, and because he did not appear to them to have significant difficulty walking with them from Close to Medium on August 31, 2017. DSMF ¶ 57.

### *Argument*

I.    Standard of Review on Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the

potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

The court must view the evidence in the light most favorable to the non-moving party, but, "as to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir. 2001). The Court is not "required to 'accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a party." *Bonefont–Igaravidez v. International Shipping Corp.,* 659 F.3d 120, 123 (1st Cir. 2011) (quoting *Torrech–Hernández v. Gen. Elec. Co.,* 519 F.3d 41, 47 (1st Cir. 2008)).

II.   Defendants Averill, Touchette and Soper Did Not Violate Soucy's Eighth Amendment Rights and Are Entitled to Qualified Immunity on the Claim under 42 U.S.C. § 1983.

Public officials sued for money damages in their individual capacities under § 1983 are entitled to qualified immunity unless (1) the facts alleged demonstrate that the individual defendant's conduct violated a statutory or constitutional right, and (2) the contours of that right were "clearly established" under then-existing law so that a reasonable official would have known that his or her conduct was unlawful. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011); *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019). "Courts may conduct this inquiry sequentially, or resolve a particular case on the second prong alone." *Barton v. Clancy*, 632 F.3d 9, 22 (2011). Qualified immunity ultimately shields "all but the plainly incompetent or those who knowingly violate the law." *Eves*, 927 F.3d at 583 (citation omitted).

> Accordingly, although there need not be a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate. The Supreme Court has not yet decided what precedents -- other than [its] own -- qualify as controlling authority. It is enough for qualified immunity purposes though that under existing

Supreme Court case law, it is at least arguable that [the government official's] actions were constitutional.

The Supreme Court has also repeatedly emphasized that the qualified immunity inquiry focuses on the objective legal reasonableness of an official's acts. Evidence concerning the defendant's subjective intent is simply irrelevant to the second step of the inquiry.  As such, if an objectively reasonable official in [the defendant's] shoes might not have known for certain that [his] conduct was unlawful, then [the defendant] is immune from liability.

*Id.* (internal quotations and citations omitted).

A.   Defendants Averill, Touchette, and Soper Did Not Violate Soucy's Rights.

In general, a plaintiff may assert a claim under the Eighth Amendment "by challenging either: (1) the deliberate indifference to serious medical need; (2) the specific conditions of confinement; or (3) the excessive use of force." *McNeeley v. Wilson*, 649 F. App'x 717, 721 (11th Cir. 2016) (unpublished). Soucy's claim falls into either the first or the third type.

1.   There was no deliberate indifference to a serious medical need.

"[A] prisoner must [raise a factual issue as to] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "[A] prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer,* 774 F.3d 63, 82 (1st Cir. 2014) (citing *Estelle,* 429 U.S. at 103). Soucy cannot establish either prong.

Regarding the **objective prong**,

The objective standard focuses on the seriousness of the risk of harm to the inmate's health. For a medical condition to be objectively "serious," there must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention. *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

*Gross v. Landry*, No. 1:17-CV-00297-JAW, 2018 WL 2210427, at *5 (D. Me. May 14, 2018), *report and recommendation adopted,* No. 2:17-CV-00297-JAW, 2018 WL 3117227 (D. Me. June 25, 2018). The record lacks any evidence that Soucy had a serious medical need. The undisputed record shows that initially, mental health was called to attend to Soucy after the transport to Medium due to his agitation and his request to see mental health. Medical staff was called only after Soucy was observed cutting his wrist. A CCS nurse treated his self-injury on his wrist and observed three drops of blood on his leg, but did not note any other injuries. Soucy declined to be assessed further in the medical clinic. The record does not show that Soucy reported any injury to medical or mental health staff who saw him on August 31, 2017, apart from the self-injury to his wrist. Soucy did not subsequently submit any requests or sick call slips for medical treatment related to a physical injury from the August 31, 2017, incident. Records of subsequent medical visits do not show that Soucy reported or sought care for a physical injury related to the move from Close to Medium on August 31, 2017.

In addition to the lack of a request for medical care after the August 31, 2017 incident, the record contains no evidence that Soucy had a medical need that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kosilek*, 774 F.3d at 82. While one could infer that he might have needed some kind of assistance to go from Close to Medium, there was no reason to think he required a wheelchair as opposed to the support of two officers on either side of him. *See Gladu v. Manning*, No. 1:18-CV-00274-GZS, 2020 WL 1539925, at *5 (D. Me. Mar. 31, 2020), *report and recommendation adopted,* No. 1:18-CV-274-GZS, 2020 WL 2754750 (D. Me. May 27, 2020) (objective prong not met).

Regarding the **subjective prong**, "[t]o satisfy this 'deliberate indifference' requirement, a plaintiff must show that state officials were 'aware of facts from which the inference could be

8

drawn that a substantial risk of serious harm exists, and ... dr[ew] the inference.'" *Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 142 (1st Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). "Deliberate indifference is akin to criminal recklessness, requiring actual knowledge of impending harm, easily preventable." *Gladu v. Correct Care Sols.*, No. 2:15-CV-00384-JAW, 2017 WL 6454016, at *9 (D. Me. Dec. 18, 2017), *report and recommendation adopted,* No. 2:15-CV-00384-JAW, 2018 WL 881759 (D. Me. Feb. 14, 2018), *aff'd,* No. 18-1167, 2019 WL 10982435 (1st Cir. Aug. 30, 2019) (internal quotation omitted). "[T]he subjective standard focuses on whether the Defendants had a 'purposeful intent' to neglect Plaintiff's serious medical needs…A showing of such an intent requires evidence that the alleged absence or inadequacy of treatment was intentional." *Gross*, 2018 WL 2210427, at *5 (internal quotations omitted) (citations omitted).

There is no evidence that any of the individual defendants were aware of facts from which they could have drawn, or drew, the inference that a substantial risk of serious harm existed if they moved Soucy from Close to Medium by escorting him on his feet, with an officer on either side supporting him, instead of using a wheelchair. They had seen Soucy walk around the Prison grounds; they were not aware of any medical restrictions on his ability to walk; CCS had not indicated any such restrictions, and confirmed that he did not require a wheelchair for the move; and, he appeared to the officers to walk without great difficulty to Medium. The record is "devoid of evidence of actual medical risk to the plaintiff[] as to make it unreasonable to conclude that the [defendants] knowingly disregarded such a risk." *Nunes*, 766 F.3d at 143.

In a Third Circuit case, the plaintiff inmate alleged his Eighth Amendment rights were violated when he was denied the use of a wheelchair, causing him to fall and injure himself on multiple occasions. *Todd v. Walters*, 166 F. App'x 590, 591 (3d Cir. 2006). The court affirmed

the grant of summary judgment, finding no indication in the record that the plaintiff, "faced painful or permanent injuries if a wheelchair was not provided, or that any Defendant was aware that this might be the case." *Id.* at 592. The court noted, "The record shows that on several occasions Todd declined accommodations, instead choosing to walk with the assistance of a walker." *Id.* Similarly, the record here shows that Soucy was ambulatory; he chose to be housed on the second floor and did not have a wheelchair assigned to him; he walked around the Close unit, up and down stairs; he pushed the chow cart down the hall; and sometimes walked to the medical unit and back with two officers escorting him. While Soucy had medical conditions that made it difficult for him to engage in strenuous activity, the medical records do not support his claim that he was medically restricted from walking a longer distance with two people alongside him supporting him.[1] As in *Todd*, "[o]n the facts in evidence, it cannot be said that any Defendant was deliberately indifferent." *Id.; see also Ward v. Deboo,* No. 1:11CV68, 2012 WL 2359435, at *2 n.3 (N.D.W. Va. June 20, 2012), aff'd, 482 F. App'x 852 (4th Cir. 2012) (evidence that inmate could ambulate without aid meant that there was nothing to suggest that health services director intentionally subjected inmate to substantial risk of serious harm by denying request for wheelchair) (citing *Todd's* "holding that, even where inmate clearly exhibits decreased mobility, he must still show defendants recognized deprivation of a wheelchair would cause 'painful or permanent' injury."). The individual defendants did not recognize that deprivation of a wheelchair for the walk from Close to Medium, with the officers providing physical support along the way, would cause "painful or permanent injury."

---

[1] In *Todd*, "the medical records show that there was no identifiable reason for his inability to walk, and it was suspected that Todd was 'malingering.'" *Id.* at 592. This case is different, where the medical records do show medical reasons for Soucy to have difficulty engaging in strenuous activity. However, the evidence shows that he could walk, with or without assistance.

In a Seventh Circuit case, the plaintiff inmate alleged his Eighth Amendment rights were violated when he was denied the use of a wheelchair to transport him from a vehicle to the prison's medical unit after returning from the hospital. *See Gilbert v. Frazier*, 932 F.2d 971, 1991 WL 79080 (7th Cir. 1991). He asked for a wheelchair because he said he was too weak to walk and walking caused extreme pain. *See id.* at *1. One of the correctional officers asked medical staff, and medical staff denied the request, stating that a wheelchair was not required. *See id.* The court stated that where the correctional officers checked with medical staff to see whether the wheelchair was medically necessary, "[t]he reliance of the officers on the doctor's medical judgment that the denial of…the wheelchair would not cause serious injury to [plaintiff] can scarcely be characterized as negligence. It certainly cannot be characterized as reckless conduct undertaken in the face of a known and serious risk. [Plaintiff's] eighth amendment claim as to [the correctional officers] is without merit." *Id.* at *2. Here, the "Current Alerts" did not say that Soucy was restricted in walking or required a wheelchair for any particular purpose. CCS also confirmed that Soucy did not need a wheelchair to travel from Close to Medium. As in *Gilbert*, the officers were entitled to rely on CCS medical staff's judgment that denial of a wheelchair would not cause serious injury to Soucy. The officers' actions were not negligent, and certainly did not rise to the level of deliberate indifference to a known and serious risk.

2.   <u>Defendants did not use excessive force.</u>

To the extent Soucy's Eighth Amendment claim is interpreted as a claim that the individual defendants used excessive force against him by dragging him, the First Circuit has explained the subjective and objective components that a plaintiff must establish:

> A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components -- one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. To prevail on the objective prong, [Plaintiff] must show that the alleged wrongdoing was objectively 'harmful enough' to

11

establish a constitutional violation. The subjective prong turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. The factors that are relevant to that ultimate determination include the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials, the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and any efforts made to temper the severity of a forceful response.

*Staples v. Gerry*, 923 F.3d 7, 13 (1st Cir. 2019) (quotation marks and citations omitted).

With regard to the **objective prong**, as discussed above, the absence of evidence that Soucy sought or requested medical treatment after the August 31, 2017, incident for any injury received during that incident shows that the incident was not harmful enough to constitute a constitutional violation.

With regard to the **subjective prong**, "the critical question … is whether the force was applied maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline." *Skinner v. Cunningham*, 430 F.3d 483, 488 (1st Cir. 2005) (quotation marks and citation omitted). Because the use of force relates to the Prison's legitimate penological interest in maintaining security and order, the court must be deferential to the conduct of prison officials. *Whitely v. Albers*, 475 U.S. 312, 321-22 (1986).

Soucy does not dispute that he refused to obey the order to move to Medium, raised his voice and argued with the officers, demanded to go to Seg instead of Medium, asked whether someone had to kill someone to be taken seriously, and threatened to hurt himself if he was not allowed to stay in Close. Under these circumstances, a reasonable factfinder could not conclude that the officers' decision to put him in hand restraints and escort him to Medium was not warranted to maintain security and order. *See Staples*, 923 F.3d at 10-14 (affirming summary judgment where inmate and officer disputed amount and manner of force used, but undisputed that inmate repeatedly refused to comply with instructions and incident had escalated into a

disturbance); *Wilbur v. Fitzpatrick*, No. 1:18-CV-00255-NT, 2019 WL 5929256, at *5 (D. Me. Nov. 12, 2019), *report and recommendation adopted,* No. 1:18-CV-255-NT, 2019 WL 6619852 (D. Me. Dec. 5, 2019) (reasonable jury could not conclude no need for force where plaintiff did not dispute his behavior prior to incident). The decision to have two officers support Soucy during the escort and a third officer present was not only reasonable but prudent because his large size required at least two officers to escort him safely in restraints.

The amount of force used was appropriate. Soucy's allegation that Touchette and Soper "dragged" him to Medium is not supported by the evidence, even viewing the facts in the light most favorable to Soucy. As Soucy described the move in his deposition, Touchette and Soper placed him in hand restraints and walked with him from Close to Medium, one on either side of him, supporting him by his arms and keeping him from falling down when he stumbled. Soucy testified that there was only one time that they dropped him to the ground, allegedly causing him to cut his leg. In his grievance about the incident, Soucy did not claim that he was dragged; instead he claimed that he had cuts and bruises from falling from being forced to walk, and the evidence shows he did not seek medical care for these alleged injuries and refused to go to the medical clinic. This evidence does not establish malicious and sadistic actions done for the very purpose of causing harm. It describes the efforts of the officers to help Soucy, who weighed about 300 pounds, to walk to Medium, which he did. Even if he stumbled along the way, fell on the ground once, and suffered cuts and bruises for which he did not seek medical care, this evidence does not rise to the level of deliberate indifference as a matter of law.

3.  Averill is not liable as a supervisor.

The claim against Averill is a claim for supervisory liability under § 1983 because Soucy does not allege that Averill dragged him. ECF No. 13 at 7 & n.3. "[T]he supervisor's liability

must be premised on his own acts or omissions." *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016). A supervisor can only be held liable for the actions of subordinates where there is an affirmative link between the supervisor and the subordinate's behavior that could be characterized as supervisory encouragement, condonation, acquiescence, or gross negligence amounting to "deliberate indifference." *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002); *see also Lipsett v. Univ. of P.R.*, 864 F.2d 881, 902 (1st Cir. 1988). "The 'affirmative link' requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Hegarty v. Somerset County*, 53 F.3d 1367, 1379-80 (1st Cir. 1995).

Soucy cannot establish that Averill knowingly tolerated any subordinate's behavior that resulted in a constitutional violation because, for the reasons discussed above, he cannot establish that either Touchette or Soper committed a constitutional violation when they escorted Soucy from Close to Medium. In addition, there is no evidence that any action or inaction by Averill "could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." *Lipsett*, 864 F.2d at 902 (internal quotations and citations omitted). Deliberate indifference requires the defendant to have been able to infer that a "substantial risk of serious harm" existed. *Guadalupe-Baez*, 819 F.3d at 515. Where CCS did not medically restrict Soucy from walking or require him to use a wheelchair, and confirmed that he did not need one; and, where Averill had seen Soucy walk around the Prison grounds, including that day when Soucy walked from his cell downstairs to the Sergeant's Office; Averill could not have inferred that a "substantial risk of serious harm" existed if he denied Soucy the use of a wheelchair or encouraged Touchette and Soper to deny him the use of a wheelchair. Averill was entitled to rely on the medical information provided by CCS. Averill also could not have inferred that a "substantial risk of serious harm" to Soucy existed by

condoning Touchette and Soper's actions of placing hand restraints on Soucy and walking on either side of him, supporting him by his arms, helping him get up when he stumbled, and escorting him in this manner from Close to Medium, when these actions were necessary to maintain security and order given Soucy's agitation and threats. The record cannot support a reasonable inference that Averill engaged in supervision amounting to deliberate indifference.

     B.  <u>Any Constitutional Violation Was Not Clearly Established.</u>

Even if the record could support a finding that any of the individual Defendants violated Soucy's Eighth Amendment rights, they are nevertheless entitled to summary judgment because neither the record evidence nor known precedent, as discussed above, support a finding that they violated clearly established law when they escorted Soucy on foot from Close to Medium, with two officers physically supporting him, instead of providing him a wheelchair. *See Eves*, 927 F.3d at 582-83. The record shows that Soucy's "Current Alerts" did not put medical restrictions on his ability to walk or specify any circumstances in which a wheelchair was required for his use; Soucy was housed on the second floor and was not assigned a wheelchair; Soucy routinely walked around the Close unit, up and down stairs, pushed the chow cart, and sometimes walked to the medical clinic and back escorted by officers; and, CCS confirmed that Soucy did not require a wheelchair to travel from Close to Medium. Defendants are not aware of any clearly established law that would have put Averill, Touchette, or Soper on notice that, faced with these facts and circumstances, they would violate the Eighth Amendment by escorting Soucy from Close to Medium on foot with an officer on each side of him to support him instead of using a wheelchair. *See Calvert v. Garner,* No. 5:10-CT-3111-FL, 2013 WL 1768975, at *6 (E.D.N.C. Apr. 24, 2013) (granting summary judgment based on qualified immunity for officers who did not provide wheelchair or crutches to injured inmate; non-medical correctional officers' failure

to recognize severity of injury not deliberate indifference where officers checked for medical authorization, followed medical staff's instructions, and allowed other inmates to help injured inmate ambulate to medical unit). Defendants are entitled to qualified immunity.

III.   The State Is Entitled to Summary Judgment on Soucy's Claim against the State under Title II of the ADA and the Rehabilitation Act.

The ADA and Rehabilitation Act "provide, in nearly identical language, that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Nunes,* 766 F.3d at 144. Disability discrimination can consist of (a) the imposition of adverse consequences on a prisoner based on the prisoner's disability, (b) a prison policy that is neutral in its terms, but impacts prisoners with a disability more significantly, or (c) the refusal by the prison administrators to grant the prisoner a reasonable accommodation so that the prisoner can have meaningful access to a prison program or service. *Id.* at 145. The Court allowed Soucy's claim against the State to proceed based on a possible inference that the use of a wheelchair that was necessary due to Soucy's disability was denied. ECF No. 13 at 13. Accordingly, the State interprets Soucy's claim as a claim of the third type identified in *Nunes* – that Soucy was denied a reasonable accommodation (wheelchair) so that he could have meaningful access to a prison program or service.

Soucy's claim is premised on his allegation that he required a wheelchair because of a disability in order to travel from the Close unit to the Medium unit. As in *Nunes*, there is no medical evidence supporting his claimed inability to walk that distance with or without assistance. While the medical record indicates that he was authorized to use a wheelchair, there is no evidence in the medical record supporting his claim that he required a wheelchair to travel the distance from Close to Medium, or that walking that distance with two officers supporting

16

him on either side was not a reasonable accommodation. In *Nunes,* the absence of medical evidence supporting the plaintiff's claimed inability was "especially pertinent because the record is undisputed that Nunes regularly walks to and from the prison cafeteria and engages in exercise, and that he recently had jobs walking with a blind prisoner and cleaning corridors." *Nunes*, 766 F.3d at 146. Likewise, it is undisputed that at the time of this incident, Soucy lived on the second floor of a building where he did not use a wheelchair, cane, or walker; he regularly walked around the unit and up and down the stairs between the first and second floor; he sometimes walked to the medical clinic supported by officers escorting him; he walked downstairs to the first floor and pushed the chow cart along the hallway; and he did not want to move to the ground floor where he could be assigned a wheelchair. On this record, no reasonable factfinder could find that the State's accommodation of providing two officers to support Soucy by holding him up on either side of him for the duration of the walk from Close to Medium, accompanied by a third officer, was not a reasonable accommodation. *See id.*

In *Kiman v. N.H. Dep't of Corrections*, the plaintiff inmate alleged under Title II of the ADA that when he returned to the prison on a parole violation, he was initially denied the use of a cane that he had begun using to help him walk while on parole. *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 277 (1st Cir. 2006). He received the cane within a few weeks. *See id.* The defendants attributed the delay to their need to verify his need for a cane, for medical and security purposes; the fact that he did not have to walk very far during the period when he was denied a cane; and, the medical need for the cane was not obvious and correctional officers would have been available to help the inmate walk, if needed. *See id.* at 285. The First Circuit agreed with the District Court that, "[o]n these facts, we agree that the defendants' delay in permitting Kiman the use of his cane while they verified his need for it was not a violation of

Title II." *Id.* Similarly, there was no obvious medical need for Soucy to have a wheelchair to travel the distance from Close to Medium; the "Current Alerts" did not indicate such a need; CCS confirmed there was no medical requirement to give Soucy a wheelchair; and, as an alternative to a wheelchair, Touchette and Soper helped him walk from Close to Medium.

In *Ericson v. Magnusson*, the plaintiff inmate claimed that the ADA was violated when he asked for and was denied a cane and a walker, among other things. *See Ericson v. Magnusson*, No. 2:12-CV-00178-JAW, 2012 WL 6967266, at *1 (D. Me. Dec. 18, 2012), *report and recommendation adopted,* No. 2:12-CV-00178-JAW, 2013 WL 395119 (D. Me. Jan. 31, 2013), *aff'd* (Sept. 12, 2014). The court explained that non-medical correctional defendants "are entitled to defer to the reasonable medical judgments of Ericson's treating medical providers on issues concerning prescriptions for medications and special equipment." *Id.* at *6 (internal quotation omitted). The court noted,

> Ericson does not allege that he was prescribed medications and equipment and that the correctional defendants then withheld these from him. Rather, he alleges that his medical condition warranted certain prescriptions and equipment, but the medical providers negligently failed to recognize and accommodate his medical needs and disabilities. As the First Circuit noted in *Buchanan,* both the state and the court are entitled to defer to the medical professionals "in determining whether a patient meets the requirements for a particular treatment program," and this issue relates to the question whether the plaintiff is a "qualified individual" under the ADA.

*Id.* at *6. Here, Soucy claims that CCS guaranteed him a wheelchair on request, he requested one, and the individual defendants withheld it from him. The record, however, does not establish that Soucy was prescribed or assigned a wheelchair, or required to be given a wheelchair under certain circumstances or upon his request. CCS's PAL sheet and DOC's "Current Alerts" did not specify any circumstances in which Soucy was required to be given a wheelchair and did not put any medical restrictions on Soucy's ability to walk. Soucy frequently walked, sometimes holding on to railings, sometimes with officers escorting him and supporting him. Soucy even walked to

18

the medical unit and back to Close escorted by officers, which was a longer distance than from

Close to Medium; and, CCS confirmed that Soucy did not need a wheelchair to travel from Close

to Medium. The non-medical DOC staff were entitled to rely on the medical information

provided to them by CCS. *See id.* at *6; *see also Grant v. Maine Dep't of Corr.*, No. 1:11-CV-

00176-JAW, 2011 WL 6782318, at *3 (D. Me. Nov. 16, 2011) (citing *Hayes v. Snyder*, 546 F.3d

516, 527 (7th Cir. 2008)).

In sum, Soucy cannot demonstrate that he required a wheelchair to travel from Close to

Medium. Soucy did walk from Close to Medium, aided by the officers who escorted him. He

also cannot show that he was denied the benefit of any programs or services.

IV.    Soucy Is Not Entitled to Damages or Injunctive Relief.

The Prison Litigation Reform Act limits a prisoner's relief in federal civil actions:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other
> correctional facility, for mental or emotional injury suffered while in custody without a
> prior showing of physical injury or the commission of a sexual act (as defined in section
> 2246 of Title 18).

42 U.S.C.A. § 1997e(e).[2] Where Soucy claimed only that he suffered minor cuts and bruises for

which he did not seek or receive medical care, Soucy cannot demonstrate that he suffered a

physical injury on August 31, 2017, sufficient to withstand summary judgment on the issue of

damages pursuant to section 1997e(e). *See, e.g., Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir.

1997) (sore, bruised ear *de minimis* and did not satisfy PLRA's physical injury requirement);

*Bullocks v. Hale*, 478 F. Supp. 3d 639, 646 (S.D. Ohio 2020) (swelling and bruising *de minimis*

---

[2] The First Circuit has yet to decide whether the limitation in § 1997e(e) on damages applies to constitutional claims. *See Kuperman v. Wrenn*, 645 F.ed 69, 73 n.5 (1st Cir. 2011). However, this Court has applied § 1997e(e) to dismiss a prisoner's First Amendment claim for damages where the prisoner sought relief for anxiety and emotional distress but had not alleged a physical injury. *Robinson v. Landry*, No. 2:15-CV-58-DBH, 2015 WL 4077297, at *2 (D. Me. July 6, 2015); *see also Schoff v. Fitzpatrick*, No. 2:16-CV-00609-NT, 2018 WL 1185499, at *9 (D. Me. Mar. 7, 2018), *report and recommendation adopted*, No. 2:16-CV-609-NT, 2018 WL 4473093 (D. Me. Sept. 18, 2018) ("persuasive authority suggests that Plaintiff cannot recover monetary relief based on Plaintiff's mental or emotional distress").

and did not satisfy PLRA's physical injury requirement); *Glosson v. Morales*, 469 F. Supp. 2d 827, 834 (S.D. Cal. 2007) (abrasion, scratch, and bumps *de minimis* and did not satisfy PLRA's physical injury requirement); *Luong v. Hatt*, 979 F. Supp. 481, 485 (N.D. Tex. 1997) (cuts and bruises did not satisfy PLRA's physical injury requirement).[3]

To the extent Soucy seeks injunctive relief against the State, his claims are moot because he has been transferred out of the Prison and he has been assigned a wheelchair since leaving the Prison. "A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release." *Ford v. Bender*, 768 F.3d 15, 29 (1st Cir. 2014).

For all of the foregoing reasons, Defendants respectfully request that summary judgment be entered in their favor on all claims.

Dated:  June 22, 2021                             Respectfully submitted,

                                                  AARON M. FREY
                                                  Attorney General of Maine

                                                  /s/ Valerie A. Wright
                                                  VALERIE A. WRIGHT, Bar No. 9166
                                                  Assistant Attorney General
                                                  Office of the Attorney General
                                                  6 State House Station
                                                  Augusta, ME  04333-0006

---

[3] Furthermore, the Eleventh Amendment bars suits for money damages against state prisons or state prison officials acting in their official capacity. *See, e.g., Wilson v. United States*, 332 F.R.D. 505, 516 (S.D.W. Va. 2019); *Nichols v. Md. Corr. Inst.*, 186 F. Supp. 2d 575, 581 (D. Md. 2002) ("The definition of 'State' [in the Eleventh Amendment] has been expanded out of necessity to include state agencies, such as the state prison system."). The Supreme Court has held in the context of state prisons, "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (disabled inmate in state prison may sue state for money damages under Title II of the ADA where the alleged conduct actually violated both the Eighth Amendment and Title II of the ADA); *Chase v. Baskerville*, 508 F. Supp. 2d 492, 506 (E.D. Va. 2007) ("[I]n the context of state prisons, Title II validly abrogates state sovereign immunity and creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment.") For the reasons argued above, as a matter of law, a reasonable factfinder could not conclude that the circumstances of Soucy's move from Close to Medium violated Soucy's constitutional rights under the Fourteenth Amendment, including his rights under the Eighth Amendment. *See Kiman*, 451 F.3d at 291 & n.19. Accordingly, the State's sovereign immunity has not been validly abrogated in this case, and for this independent and additional reason, the State is entitled to summary judgment on Soucy's claim for damages under Title II of the ADA.

Tel.:  207-626-8800
Fax: (207) 287-3145
valerie.a.wright@maine.gov

Attorneys for Defendants State of Maine, Averill,
Touchette, and Soper

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2021, I electronically filed the above document with the

Clerk of Court using the CM/ECF system and caused a copy of said document to be mailed by

First Class Mail, postage prepaid to:

Ricky Soucy, Sr., #82858
Mountain View Correctional Facility
1182 Dover Rd.
Charleston, ME  04422

/s/ Valerie A. Wright
VALERIE A. WRIGHT, Bar No. 9166
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
valerie.a.wright@maine.gov